**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**



| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF TENNESSEE AND THE STATE OF GEORGIA *EX REL.* JANET E.CHAMBERS, | Civil Action No. \_\_\_\_\_ |
| Plaintiffs, | **FILED UNDER SEAL** Pursuant to 31 U.S.C. § 3730(b) |
| v. | **FALSE CLAIMS ACT COMPLAINT** |
| SKIN CANCER AND COSMETIC DERMATOLOGY CENTER, PC AND JOHN Y. CHUNG, M.D., | **DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** |
| Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Relator, Jan Chambers, on behalf of herself and the United States of America, the State of Tennessee and the State of Georgia, and alleges as follows:

1.

This action is brought on behalf of the United States of America, the State of Tennessee and the State of Georgia pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA"), the Tennessee Medicaid False Claims Act, T. C. A. §§ 71-5-181, et. seq. ("Tennessee MFCA" and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, et seq. ("Georgia FMCA"), premised on Defendants' knowing submission of false or fraudulent claims for payment to federal (Medicare, Tricare, Federal Employees Health Benefits Program and the Veterans Administration) and state government healthcare payors (Tennessee and Georgia Medicaid) (collectively referred to herein as "Government Payors") for dermatological surgical procedures to treat skin cancer that are performed at Defendant Skin

Cancer and Cosmetic Dermatology Center, PC's clinics by unqualified, sometimes nonmedical personnel and fraudulently billed to Government payors as if performed by Defendant John Y. Chung, M.D. Dr. Chung is a dermatological surgeon and the sole owner of Defendant Skin Cancer and Cosmetic Dermatology Center, PC ("SCCDC").

2.

Defendants employ mid-level providers (nurse practitioners and physician assistants) and have them conduct sensitive surgical procedures that Government Payors mandate may only be performed by physicians to be eligible for payment, and fraudulently bill the services to Government Payors claiming that Defendant Chung had performed them. Defendants have been engaged in this fraudulent activity since at least as early as June 2010 and continue it to the present day.

3.

Defendants' fraudulent scheme involves false billing for procedures related to Mohs Micrographic Surgical services (commonly referred to as "MMS" or "Mohs"). Mohs is a precise surgical procedure to treat certain skin cancers. In the Mohs procedure, a surgeon successively excises (removes) layers of a previously diagnosed cancerous lesion on the patient's skin and concurrently analyzes the skin specimens he or she has removed under a microscope until no cancer is detected. The analysis of the excised skin specimens is referred to as pathology.

4.

Many cancerous skin lesions can be treated by simply removing the lesion. Government Payors will reimburse providers for the more sophisticated (and more expensive) Mohs procedure for specific types of lesions, but only if the procedure is performed by a physician and that physician performs both the excisions on the lesion and concurrently does the pathology on

2

each skin specimen removed. See CPT Codes 17311, 17312, 17313, 17314 and 17315; CMS Local Coverage Determination L33436 now located at CMS Local Coverage Article A56732; and CMS Medicare Learning Network instruction at MLN Matters® Number SE1318. "CMS" is the Center for Medicare and Medicaid Services and is the agency that administers the Medicare Program.

5.

CMS explicitly spells out in simple terms that it is a condition of payment for a Mohs procedure that a physician do *both* the excising of layers and the pathology, and that the *same* physician must do both: "Medicare will only reimburse for MMS services when the Mohs surgeon acts as **both** surgeon and pathologist. You may not bill Medicare for these procedures if preparation or interpretation of pathology slides is performed by a physician other than the Mohs surgeon." MLN Matters® Number SE1318 (emphasis in original).

6.

This requirement is not a minor technicality – the Mohs procedure is literally defined as the same surgeon providing both services – that is what the procedure is and why it works better than standard excision on certain specific types of cancerous lesions. See CPT Codes 17311, 17312, 17313, 17314 and 17315; CMS Local Coverage Determination L33436 (entitled "MOHS Micrographic Surgery (MMS)(L33436)" now located at CMS Local Coverage Article A56732 (herein after referred to as LCD L33436"); and CMS Medicare Learning Network instruction at MLN Matters® Number SE1318.

7.

CMS instructs providers that only physicians may perform MMS and that the physician must be specifically trained in Mohs surgery techniques. "[Y]ou should be aware of Mohs Medicare coverage limitations:

> 1) Only physicians (MD/DO) may perform MMS;
>
> 2) The physician performing MMS must be specifically trained and highly skilled in MMS techniques and pathological identification; and
>
> 3) As mentioned above, if the surgeon performing the excision using MMS does not personally provide the histological evaluation of the specimen(s), the CPT codes for MMS cannot be used, rather the codes (11600-11646) for the standard excision of malignant lesions should be chosen."

MLN Matters® Number SE1318.

8.

So if Defendant Chung conducts a Mohs procedure properly and in accordance with Government Payer reimbursement rules, he cannot conduct multiple Mohs procedures concurrently and should only be able to conduct several Mohs procedures in a day due to the complexity and amount of time that each legitimate Mohs procedure takes.

9.

Defendants are fully aware of the requirement that Dr. Chung must personally do both the excisions and the pathology to qualify and bill the procedure as a Mohs/MMS procedure. For example, Defendants proclaim on their website, "100% of your tissue margins are examined **by the same physician who serves as both surgeon and pathologist.**" https://www.thedermcenters.com/service-category/mohs-micrographic-surgery/, last accessed on 6-24-2020 (emphasis added).

4

10.

Defendants demonstrate their keen awareness of the requirement that a skilled, specially trained surgeon, such as Dr. Chung, must do the surgical excision of the cancerous lesion in a Mohs procedure. On the SCCDC website, Defendants advertise that the "cure rate" for skin cancer using a Mohs procedure when conducted by a "Mohs surgeon [who] is specially trained as a cancer surgeon, pathologist, and reconstructive surgeon" is higher than the cure rate for standard surgical excisions. https://www.thedermcenters.com/dr-chung-on-mohs-surgery/, last accessed on 6-24-2020.

11.

CMS also mandates that each Mohs patient's medical records should reflect [truthfully] that the same physician did the excision and the pathology in the procedure:

> Operative notes and pathology documentation in the patient's medical record should clearly show MMS was performed using accepted Mohs technique, **in which the physician acts in two integrated and distinct capacities: surgeon and pathologist (e.g., should show that true Mohs surgery was performed).**

LCD L33436 at p. 2 of 9, "MMS Coverage Guidance" under "Documentation Requirements" (emphasis added).

12.

Defendants take that explicit language and deceptively falsify the medical records of many Mohs patients whose surgery was done by a mid-level by stating, "Dr. John Chung operated in two distinct and integrated capacities as the surgeon and pathologist." See for example, Exhibit A, Patient MH, at p. 3.

5

<u>Unqualified Mid-levels Doing Mohs Surgeries Billed as Dr. Chung</u>

13.

Defendants have built their business model around conducting Mohs procedures using unqualified physicians' assistants or nurse practitioners ("mid-levels") to do the surgical excisions of cancerous tissue and fraudulently billing Government Payors as if the excisions were performed by Dr. Chung.   While telling the world that "Mohs surgery is so effective due to the way the specimen is removed and examined under the microscope," https://www.thedermcenters.com/dr-chung-on-mohs-surgery/, SCCDC uses unqualified mid-levels  to do the surgical excisions of diseased tissue in Mohs procedures billed as done by Dr. Chung.

14.

Defendants knowingly violate the requirements for billing the Government for Mohs procedures and schedule multiple Mohs procedures (as many Mohs procedures as there are exam rooms in the clinic, 8 to 15 at a time, depending on the size of the  clinic location). The Chattanooga, TN, clinic has 15 surgical rooms; Blue Ridge, GA has 13; Dalton, GA has 12; Cleveland, TN, has 10  and Rome, GA has 8 surgical rooms.

15.

SCCDC patient schedulers fill out electronic schedule templates for Mohs procedures at the 5 SCCDC clinic locations at which Mohs procedures are conducted.  The schedule templates are created by Dr. Chung, SCCDC COO Kelley Finnell and Dr. Chung's sister, Esther Shin, to accomplish the scheme to fraudulently maximize revenue with increased volumes of Mohs by having multiple mid-levels, not Dr. Chung, removing of layers of cancerous lesions in the Mohs procedures.  The patient schedulers fill in the appointment times on the template with as many

Mohs procedures as there are surgical rooms at each of the 5 clinics that handle Mohs procedures.

16.

For example, on March 30, 2020, in the Chattanooga clinic Defendants scheduled 5 Mohs procedures for 7:30 AM ; 4 more at 7:45 AM; 1 at 8:00AM; 2 at 8:30 AM; 5 more at 8:45AM and on and on until 2:15 PM when the 49th Mohs patient procedure was commenced. See Exhibit D hereto, a table showing each SCCDC patient treated on March 30, 2020 whose treatment was billed as having been performed by Dr. Chung, redacted for patient confidentiality. Relator has provided the medical records and claim forms on each of the 110 patients listed on Exhibit D to the Government before filing this complaint. Throughout the day, Dr. Chung reviewed specimens while mid-levels did the surgical removal of layers of cancerous lesions that he was required to do to lawfully bill the Mohs procedure to Government Payors. SCCDC billed all Mohs on that day as having been performed by Dr. Chung. See claim forms for patients listed on Exhibit D.

17.

Dr. Chung signs the charts of Mohs patients on whom mid-levels did the surgical removal of layers to hide the fact that mid-levels did the removals. Relator has unsuccessfully challenged Dr. Chung and SCCDC Chief Operating Officer Kelley Finnell about this deceptive practice of Dr. Ching falsifying medical records by signing operative notes on operations he did not perform. This is a central part of SCCDC's fraudulent business model.

18.

Jeremy Micheff is one of the mid-levels employed by SCCDC who has been performing Mohs layer removals and closings following Mohs, as well as excisions of other skin lesions

7

outside of Mohs procedures for many years. SCCDC and Dr. Chung have regularly had Micheff do layer removals as part of a Mohs procedure but still billed the Mohs procedure to Government Payors as if Dr. Chung performed the surgical removal of the layers. That conduct is both fraudulent and unsafe for SCCDC patients.

19.

SCCDC regularly scheduled nurse practitioner Jeremy Micheff and other mid-levels to do excisions of skin lesions (not part of a Mohs procedure) and fraudulently billed those excisions as if Dr. Chung had performed them. In February 2020, Relator confronted Dr. Chung about the imperative that Dr. Chung not bill for excisions done by Jeremy Micheff. Dr. Chung protested that he, Dr. Chung, had done the work. Relator pushed back and pointed out that the surgical excisions were literally on Jeremy's schedule. Dr. Chung immediately had his office staff access SCCDC's electronic schedule for Mr. Micheff and move all of the excisions off of Jeremy's schedule and onto his own schedule to hide the paper trail tracking this continued fraud.

20.

The falsity of Defendants' claims that Dr. Chung did the layer removals and the pathology in the Mohs procedures is starkly evident from a quick look at a one-day sample of the procedures billed as performed by Dr. Chung. In short, there are not enough hours in the day for him to have done the work and he could not have been in multiple places at the same time.

21.

March 30, 2020 is a sample of a typical day on which SCCDC does Mohs procedures. As demonstrated in Exhibit D, SCCDC providers treated 110 patients in 9 different SCCDC locations (5 in TN and 4 in GA) on March 30, 2020. The surgical procedures on each of these

patients were billed by SCCDC and Chung as if they were personally performed by Dr. Chung. Relator Chambers has provided to the Government the medical record and the claim form for each procedure. Forty-nine (49) of them are Mohs surgical procedures, sixteen (16) are excisions of benign lesions and the rest are either superficial radiation therapy treatments ("SRT") or dermatological office exams. See Exhibit D hereto, redacted to protect patient privacy.

22.

For the Mohs procedures, alone, performed on 3-30-2020, the wRVUs/time required to complete them totals well over an incredible 170 hours. Exhibit D demonstrates that Dr. Chung is claiming to have personally performed surgical services in 9 different locations, ranging from Dayton, TN down to Rome, GA, on 110 patients, 49 of whom underwent complex, time consuming Mohs procedures in one business day.

23.

More than half of this one-day sample of patients are government healthcare beneficiaries, including Medicare, Tricare, TennCare and GA Medicaid.

24.

As exampled by Exhibit D, SCCDC and Dr. Chung regularly bill for an incredible 20 – 50 Mohs procedures a day, 4 days a week, every week. That surgical and pathological volume is not humanly possible for Dr. Chung or any physician to achieve in a 24-hour day, much less in an 8-hour work day.

9

25.

Defendants' treatment of cancer patients needing Mohs procedures is callous and dangerous; patients are herded into 8 to 15 treatment rooms at the same time (depending on the size of a given clinic) to be unwittingly operated on by unqualified personnel in order to line SCCDC's and Chung's pockets with ill-gotten Government healthcare money. This fraudulent conduct has propelled Dr. Chung within the top 20th percentile *nationwide* in terms of Mohs Procedures billed to Medicare. See "Medicare Unmasked," https://graphics.wsj.com/medicare-billing/#1710943709, last accessed on June 24, 2020 (Medicare payment data 2012 through 2015).

26.

In Georgia, Dr. Chung is in the 88th percentile or higher in terms of the number of the most common Mohs procedures for which he bills Medicare (CPT codes 17311, 17312 and 17313); in the 69th percentile of billers for the Mohs procedures in which four or more layers are removed (CPT code 17314). *See* "ProPublica Treatment Tracker," https://projects.propublica.org/treatment/doctors/1710943709, last accessed on June 24, 2020 (Medicare Payment data from 2015).

27.

These overtly excessive levels of purported Mohs procedures billed to Medicare are the result of Defendants' falsely billing for services performed by others, not Dr. Chung. These figures also demonstrate the enormous extent of damages to the Government from Defendants' fraudulent billing.

10

28.

Indeed, Dr. Chung and SCCDC bill for more Mohs procedures in a day than there are hours in a calendar day and do so unabashedly on a regular basis. That is because Dr. Chung is not in fact personally performing the surgeries for which he and SCCDC seek and obtain Government reimbursement.

## Fraudulent Billing for Closing/Repairing Wounds Following Mohs procedures
### (Unqualified mid-levels doing more surgery billed as Dr. Chung)

29.

An even more lucrative fraud scheme built into Defendants' business model is Defendants' use of mid-levels to repair/close the wounds created by the Mohs procedure and fraudulently billing Government Payers as if either another SCCDC physician did it or that Dr. Chung did it.[1] The reimbursement rates for wound repairs following Mohs are approximately 30% higher than the reimbursement rate for the Mohs procedure. See Exhibit E hereto, a table showing charges for Mohs and for the corresponding wound closure for one-month.

30.

There are numerous possible CPT codes to use to bill for a repair/closing, depending on the size and complexity of the wound. See, e.g., CPT codes billed for closures on Exhibit D.

31.

The CPT codes falsely billed to Government Payors for repairs following Mohs that are performed by employed mid-levels or medical assistants are numerous but the codes most commonly billed by SCCDC are as follows: CPT 14000, 14001, 14020, 14021, 14040, 14041,

---

[1] The Mohs procedure and the wound closing are not "bundled" and are billed using different CPT codes.

14060, 14061, 14301, 14302, 15220, 15221, 15240, 15241, 15260, 152610, 15610, 15620, 15630, 13100, 13101, 13102, 13120, 13121, 13122, 13131, 13132, 13133,13151, 13152 and 13153. These codes are hereinafter referred to as "Wound Closing CPT codes."

32.

SCCDC and Chung have their employed mid-levels and medical assistants ("MAs") do the closing/repairs but bill them using one or more of the Wound Closing CPT codes under Chung's name and provider number or another SCCDC's name and provider number to deceive Government Payors and obtain the reimbursement. See for example Exhibit A at p. 2 ("Closing Provider: Jamie Micheff, FNP-C") and at p. 7 (Claim form includes charge for Wound Closing CPT code 14040 and identifies Dr. Chung, i.d. #171094709, as the provider of that service).

33.

SCCDC and Chung know the closing procedures are not properly billable as performed by Dr. Chung if a mid-level or a MA did them, but they fraudulently bill those surgical procedures on a regular basis as having been done by Dr. Chung.

34.

SCCDC and Chung's claims for reimbursement for the closing procedures following Mohs are false because they identify Dr. Chung or another physician as the rendering provider rather than billing the procedure under the NPI number of the mid-level who did the work. See for example, Exhibit A. Medical assistants could not be billed as doing any of the closing procedures because they do not have NPI numbers – they are nonmedical personnel with no medical education or training. Mas should not be doing closings at all, but SCCDC has them do them and bills them as Dr. Chung.

35.

SCCDC increases the risk of patient harm and scarring by allowing mid-levels and MAs to close wounds rather than having a trained and qualified physician do so.

Fraudulent Separate Billing for Mohs Surgery and Wound Closing to Avoid Multi-surgery Reduction

36.

Defendants' have perpetrated another fraudulent scheme related to closings/repairs following Mohs that started at least as far back as June 2010 and ended in September 2017, due to Relator's actions.

37.

If two related surgical procedures are performed on the same patient on the same day, Government Payers reduce the reimbursement of the less costly procedure by 50% because the patient does not have to be prepped twice and other costs are also reduced. This is referred to as the multi-surgery reduction.

38.

To fraudulently avoid the multi-surgery reduction, Defendants' practice since at least June 2010 was to bill Government Payors for the Mohs procedure on one bill and then separately bill for the procedure to close the wound using a separate claim form. Defendants intentionally split the billing for the closing procedure from the billing for the related Mohs procedure to obtain 100% reimbursement for both the Mohs procedure and the closing/repair procedure afterwards.

39.

SCCDC and Dr. Chung billed the Mohs procedure under Dr. Chung's name and, independently and separately, billed the closing procedure under the name and i.d. number of

13

another physician employed by SCCDC.  See for example, Exhibit B(1) and B(2) hereto, redacted medical records and claim forms for Medicare Patient WS for Mohs procedures and closings on 10-19-2015 and again on 12-14-2015.

40.

Exhibit B(1) is the redacted medical record of Medicare Patient WS's Mohs procedure and the related closing procedure on 10-19-2015.  SCCDC billed Medicare separately for the Mohs procedure under Dr. Chung's name and for the closing procedure under SCCDC employee Dr. Luis Gomez-Vaca's name.  See pages 3 and 4 of Exhibit B(1).  Exhibit B(2) is another Mohs procedure on the same patient  that took place on 12-14-2015.  SCCDC again billed Medicare separately for the Mohs procedure under Dr. Chung's name and for the closing procedure under Dr. Luis Gomez-Vaca's name.  See pages 4 and 5 of Exhibit B(2).

41.

The reimbursement for the closing procedure is usually higher than the reimbursement for the Mohs procedure, so Defendants defrauded Government Payers out of 50% of the reimbursement for Mohs procedures.  In the example of exhibit B(1), Defendant  knowingly defrauded Medicare out of ½ of the reimbursement for Patient WS' Mohs under CPT code 17313, or $377.50.  Defendants should have billed for the Mohs and the closing on the same claim form.

42.

Once Relator stopped SCCDC's split billing as of 9-1-2017, Defendants had no reason to pretend that another physician was involved in doing the closing procedures, so they commenced billing all closings/repairs by mid-levels and MAs as having been performed by Dr. Chung.  See for example Exhibit C hereto, redacted medical records and claim form for a Mohs procedure

14

and closing on Medicare patient, Patient WS, that took place on 8-5-2019. As seen in Exhibit C, SCCDC billed the Mohs procedure as having been conducted by Dr. Chung and the related closing procedure also as having been done by Dr. Chung, on one claim form. The billing was not split, but the claim is false because the closing was performed by mid-level Jeremy Micheff, not by Dr. Chung, as was billed to Medicare. See Exhibit C.

43.

Relator, in consultation with the SCCDC billing department manager she had hired, decided to stop SCCDC's split billing of the Mohs procedures and the related closings/repairs effective September 1, 2017

44.

Dr. Chung was angry with Relator when he discovered that she had not split billed those procedures since September 1, 2017 and confronted her in March 2018 about costing him so much money in reimbursements by not split billing.

45.

Dr. Chung directed Relator to rebill the claims for Mohs and closings between 9-1-2017 and 3-31-2018, separately, and to financially quantify the dollars that she had "cost him" by properly billing the two surgeries together during that period.

46.

Relator analyzed the billing records of the Mohs patients during that period and reported to SCCDC and Chung that between 9-1-2017 and 3-31-2018 SCCDC had billed $2,668,449 for Mohs procedures and the reimbursement was reduced by $1,334,224.50 due to seven months of application of the multi-surgery reduction rule due to Relator's proper billing of the two related surgeries together in one claim.

15

47.

Faced with Dr. Chung's wrath and Kelley Finnell's push to go back to split billing, Relator tuned to a professional billing consultant in April 2018 who confirmed her fear that the split billing for Mohs and the related closing was "fraudulent." She took that information to SCCDC and Chung who eventually agreed not to go back to split billing. SCCDC and Dr. Chung did not return any money to Government Payors to which money they were not entitled due to the fraudulent split billing.

## THE PARTIES

48.

Defendant SCCDC is a Georgia professional corporation with its principal office located at 2553 Chambliss Ave., N.W., Suite 300, Cleveland, TN 37311. Defendant Chung is the sole owner, CEO, CFO, Secretary and registered agent for SCCDC. The registered agent can be served at 1107 Memorial Drive, Dalton, GA 30720.

49.

SCCDC has 14 facilities: one is administrative (located in Ringgold, GA), one is a laboratory and 12 are patient treatment clinics that treat patients for skin cancer.

50.

SCCDC patient treatment clinics are located in Tennessee (Athens, Chattanooga-Waterside, Chattanooga-Main Street, Cleveland, Dayton, Hixson, and Kimball) and in Georgia (Blue Ridge, Calhoun, Cartersville, Chatsworth [closed June 2020], Dalton, and Ringgold ). See Map of locations from SCCDC website, attached here to as Exhibit E.

16

51.

SCCDC employs 33 midlevel providers (nurse practitioner and physician assistants), 6 doctors (MDs), and several medical assistants.

52.

In addition to Mohs procedures, SCCDC clinics do Superficial Radiotherapy skin cancer treatments, commonly known as "SRT," excisions of benign or cancerous lesions and all other dermatological treatments.

53.

Defendant Skin Cancer and Cosmetic Dermatology only employs one dermatologist, Dr. Chung.

54.

Defendant Chung is a 59-year-old dermatological surgeon. He owns 100% of Defendant SCCDC and controls every aspect of its business.

55.

Based on Medicare billing data, Dr. Chung does more Mohs procedures than any other provider in Georgia or Tennessee and does more Mohs procedures than at least 80% of all dermatologists in the United States of America. See "Medicare Unmasked," https://graphics.wsj.com/medicare-billing/#1710943709, last accessed on June 23, 2020 (Medicare payment data 2012 through 2015).

56.

Dr. Chung resides in Dalton, Georgia.

57.

Plaintiff-Relator Chambers ("Relator") is an individual and a resident of the State of Georgia. She has been an employee of Defendant SCCDC since 2013 and is currently the Director of Office Operations. In that position, she oversees the billing department and has plenary access to all patient medical records and provider schedules .

58.

Relator's office is in SCCDC's administrative office in Ringgold, GA, but her job requires that she travel among the 13 SCCDC patient clinics regularly. Relator reports to Dr. Chung and to SCCDC's Chief Operating Officer, Kelley Finnell. Esther Shin is Dr. Chung's sister and exercises significant authority in decision making about various aspects of the practice. Ms. Shin requests Relator to undertake projects or answer questions related to the practice on an occasional basis.

59.

Relator started with SCCDC in June 2013 when Dr. Chung hired her as a medical assistant to work in Dalton, GA. She was trained on the job by another medial assistant to follow and assist mid-levels and physicians. Relator had no medical education but had owned a medical transcription company for 13 years and was familiar with medical terminology and patient medical records.

60.

Relator has worked with Defendant Chung on a daily basis and has repeatedly personally observed his directives and SCCDC's consistent practice of having mid-levels do the Mohs removal of layers and the wound closures following Mohs, while Dr. Chung does the pathology on the Mohs specimens. Relator has personal knowledge that SCCDC and Dr.

Chung knowingly bill Government Payors for those midlevel services as if Dr. Chung or, more commonly prior to 9-1-2017, as if another physician, performed them.

## JURISDICTION AND VENUE

### 61.

Relator brings this action on behalf of herself and the United States for violations of the False Claims Act; on behalf of the State of Tennessee pursuant to the Tennessee MFCA and on behalf of the State of Georgia pursuant to the Georgia MFCA.

### 62

This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over claims arising under the Tennessee MFCA and the Georgia FMCA, as provided under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732.

### 63.

This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District. See 31 U.S.C. § 3732(a).

### 64.

Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

65.

Relator's claims are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(c)(4)(A).

66.

To the extent that there has been a public disclosure unknown to the Relator, she Relator is the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relator has independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id*. Relator is an SCCDC "insider" who has personally observed the offending fraudulent conduct described herein for the last seven years.

67.

The expectation that surgeries are performed by fully credentialed and qualified physicians and that any claim submitted is for those services and not the services of another is at the very core of the regulatory scheme. Violation of these requirements is material as that term is defined in the federal and state false claims Acts and interpreted by the courts.

68.

No federal or state Government Payor has paid SCCDC claims with actual knowledge that Defendants had violated the requirements that the actual rendering provider be accurately identified on the claim form and that only physicians may perform Mohs and that the same physician must do both the excisions and the pathology during a Mohs procedure. No Government Payor was aware that the SCCDC patients were being placed

20

at higher risk of scarring and permanent damage because SCCDC places profits above safety and compliance concerns.

## APPLICABLE LAW

**A.** <u>Statutory and Regulatory Provisions Applicable to Defendants' False Claims</u>

    **1.** Government Health Care Programs Impacted by Defendants' Fraud

69.

The federal and state governments, through Medicare and Medicaid (including Tennessee Medicaid, known as "TennCare," and Georgia Medicaid) are among the principal payors responsible for reimbursing Defendants for Mohs and related surgical procedures. Medicare is a federal government health care program that primarily benefits the elderly and the disabled. It was created by Congress in 1965 and is administered by the Center for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS").[2]

70.

Medicare Part B covers the cost of a physician's services only if the services are medically necessary and are provided in accordance with any coding and billing requirements for the services.

---

[2] SCCDC has also defrauded Tricare, the VA and the Federal Employees Health Benefits Program in the same fashion as set forth herein with regard to Medicare and Medicaid.

21

71.

CMS establishes rules for the day-to-day administration of Medicare. CMS also publishes guidance to providers to assist them in complying with billing and coding requirements, such as CMS' Medicare Learning Network Matters®, organized by number and subject matter. These are referred to as "MLN Matters" and are available on the CMS website, among other locations.

72.

CMS contracts with private companies, Medicare administrative contractors (commonly referred to as "MACs"), to handle day-to-day administration of Medicare in geographic regions of the country.

73.

CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for medical services and procedures that are billed to Government Payers using Current Procedural Terminology ("CPT") codes. CPT codes definitively describe medical procedures for purposes of seeking reimbursement from health insurers. CPT codes are used to bill /seek reimbursement from Government Payers as well as private, commercial payers.

74.

Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses primarily for low-income patients. Funding for Medicaid is shared between the federal and the state governments. The federal government also separately matches certain

state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage.

75.

The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans. FEHBP plans are managed by the U.S. Office of Personnel Management.

76.

TRICARE is a federal program which provides civilian health benefits for military personnel, certain military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government.

77.

At all times relevant to this Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

**B.** Reimbursement Rules and Certifications

78.

When submitting claims for reimbursement to Government Payers, SCCDC and Chung are required to use the Health Insurance Claim Form, also known as the Form 1500 ("Claim Form"). See for example claim form (2 sided) attached hereto as Exhibit A, p. 7.

23

79.

The Claims Form requires the submitting entity to certify, that:

> 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment … ; and 5) the services on this form were medically necessary … . This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Claim Form at 2.

**1.** Coding and Billing for Mohs Procedures

80.

There are 5 CPT codes that may be used to bill for the Mohs procedure, depending on how many layers or "blocks" of tissue have to be removed before the "margins are clear"/no more cancer is seen in the microscopic analysis of the specimens. See, e.g., Local Coverage Article A56732, "Billing and Coding: MOHS Micrographic Surgery (MMS)", rev. effective date 1-10-2020.

81.

The two primary CPT codes used to bill for Mohs are 17311, 17312 and 17313. CPT Code 17311 describes the service performed as "Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color

coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), head, neck, hands, feet, genitalia, or any location with surgery directly involving muscle, cartilage, bone, tendon, major nerves, or vessels; first stage, up to 5 tissue blocks." MLN Matters® Number SE1318, p. 2 of 4.

82.

CPT Codes 17312 -17315 are used to bill for the removal and pathology on subsequent layers.

**C.** <u>The False Claims Act, The Tennessee False Medicaid Claims Act and The Georgia Medicaid False Claims Act</u>

83.

The federal False Claims Act, the TN FMCA and the GA FMCA all make actionable the knowing submission of claims for payment for healthcare services that are not eligible for reimbursement. See FCA, 31 U.S.C. § 3729(a)(1); TN FMCA, T.C.A § 71-5-182(a)(1)(A) and GA FMCA O.C.G.A. § 49-4-168.1(a)(1). Relator has provided herein numerous examples of actual false claims submitted by Defendants to Medicare, Tricare, TennCare and Georgia Medicaid for services related to Mohs surgical procedures, repairs/closings following Mohs and excisions performed by mid-levels and billed as Dr. Chung. All of the claims exampled herein were paid by the Government Payors to which they were submitted.

84.

Relator has in writing disclosed to the United States, the State of Tennessee and to the State of Georgia all material evidence and information about this action and Defendants' conduct in her possession prior to filing this complaint.

25

Defendants' knowing misrepresentations are material to the governments' payment decisions. The Mohs procedure is billable by a specific set of CPT codes that connote that the procedure was conducted as described in the CPT code used to bill. Defendants submit claims for payment using those CPT codes knowing that the Mohs procedures have not been performed in a very fundamental way as described in those codes. CMS has expressed the requirement that the same physician must both remove the layers of cancerous tissue and do the pathology on those specimens in order to bill using Mohs CPT codes. Defendants acknowledge that requirement in their website and in their falsification of patient medical records to hide their fraudulent conduct.

86.

The federal False Claims Act, the TN FMCA and the GA FMCA all make actionable the knowing use of a false or fraudulent statement or record material to a false claim for payment or approval by the Government. See FCA, 31 U.S.C. § 3729(a)(2); TN FMCA, T.C.A § 71-5-182(a)(1)(B) and GA FMCA O.C.G.A. § 49-4-168.1(a)(2). Relator has provided herein numerous examples of patient medical records falsified to show Dr. Chung as having done procedures that Defendants knew were in fact done by mid-level providers or MAs, which procedures were fraudulently billed to Government Payors. Relator has also provided numerous examples of claims that are factually false because they identify Dr. Chung as the rendering provider when in fact, he was not the rendering provider

## COUNT I

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)

87.

All of the preceding allegations are incorporated herein.

88.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

89.

By virtue of the conduct described above, Defendants knowingly caused to be presented to Medicare, Medicaid, and other Government funded health insurance programs false or fraudulent claims for the improper payment or approval of claims for: Mohs procedures and for repairs following Mohs procedures, which did not comply with Medicare and Medicaid rules;

90.

The United States, unaware of the falsity or fraudulent nature of the claims that Defendants submitted, paid for claims that otherwise would not have been allowed. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT II

### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

91.

All of the preceding allegations are incorporated herein.

92.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

93.

By virtue of the conduct described above, Defendants knowingly caused to be made or used false records or statements material to false claims submitted or caused to be submitted for payment or approval by the United States government.

94.

The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT III

### TENNNESSEE MEDICAID FALSE CLAIMS ACT, Presentment of False Claim for Payment, T.C.A § 71-5-182(a)(1)(A)

95.
All of the preceding allegations are incorporated herein.

96.

This is a claim for treble damages, consequential damages, and civil penalties pursuant to the Tennessee Medicaid False Claims Act T. C. A. §§ 71-5-181, et. seq.

97.

By virtue of the conduct described above, Defendants knowingly caused to be presented to government funded health insurance programs, including Medicaid, false or fraudulent claims for the improper payment or approval of claims for Mohs

28

procedures and for repairs following Mohs procedures.

98.

The State of TN, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

99.

By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

## COUNT IV

**TENNESSEE MEDICAID FALSE CLAIMS ACT, Use of False Record Material to a False Claim for Payment, T.C.A. § 71-5-182(a)(1)(B)**

100.

All of the preceding allegations are incorporated herein.

101.

This is a claim for treble damages, consequential damages, and civil penalties pursuant to the Tennessee Medicaid False Claims Act, T.C.A. §§ 71-5-181, et. seq.

102.

By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the government.

103.

Because Defendants have failed to reimburse the State of Tennessee for sums it received unlawfully by virtue of the conduct described above, the state of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

29

**COUNT V**

**GEORGIA MEDICAID FALSE CLAIMS ACT, Presentment of False Claim for Payment, O.C.G.A. § 49-4-168.1(a)(1)**

104.

All of the preceding allegations are incorporated herein.

105.

This is a claim for treble damages, consequential damages, and civil penalties pursuant to the Georgia Medicaid False Claims Act, O.C.G.A. §§ 49-4-168, et. seq.

106.

By virtue of the conduct described above, Defendants knowingly caused to be presented to government funded health insurance programs, including Medicaid, false or fraudulent claims for the improper payment or approval of claims for Mohs procedures and for repairs following Mohs procedures.

107.

The state of Georgia, unaware of the falsity or fraudulent nature of the claims that Defendants causes, paid for claims that otherwise would not have been allowed.

108.

By reason of these payments, the State of Georgia has been damages and continues to be damaged, in a substantial amount.

**COUNT VI**

**GEORGIA MEDICAID FALSE CLAIMS ACT, Use of False Record Material to a False Claim for Payment, O.C.G.A. § 49-4-168.1(a)(2)**

109.

All of the preceding allegations are incorporated herein.

110.

This is a claim for treble damages, consequential damages, and civil penalties pursuant to the Georgia Medicaid False Claims Act, O.C.G.A. §§ 49-4-168, et. seq.

111.

By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the government.

112.

Because Defendants have failed to reimburse the State of Georgia for sums it received unlawfully by virtue of the conduct described above, the state of Georgia has been damaged, and continues to be damaged, in a substantial amount.

**PRAYER FOR RELIEF**

113.

WHEREFORE, for each of these claims, Relator requests the following relief from each of the Defendants, jointly and severally, as to the federal and state claims:

114.

Three times the amount of damages that the federal and state governments sustain because of the acts of Defendants;

115.

A civil penalty of not less than $ 11,665 and not more than $ 23,331 for each violation of 31 U.S.C. §3729;

116.

A civil penalty of not less than $ 5,000 and not more than $25,000 per violation for claims encompassed by the TN Medicaid False Claims Act pursuant to T.C.A. § 71-5-182.

117.

A civil penalty of not less than $ 11,665 and not more than $ 23,331 for each violation of the GA Medicaid False Claims Act pursuant to O.C.G.A. § 49-4-168.1.

118.

The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d), T.C.A. § 71-5-183, and O.C.G.A. § 49-4-168.2 for collecting the civil penalties and damages;

119.

The Relator be awarded reasonable attorneys' fees and costs pursuant 31 U.S.C.§ 3730(d), T.C.A. § 71-5-183, and O.C.G.A. § 49-4-168.2, interest; and such further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

Relator Jan Chambers by her attorneys,

Susan S. Gouinlock
Georgia Bar No. 303217*
ssg@wilbanksgouinlock.com
Marlan B. Wilbanks
Georgia Bar no. 758223*
mbw@wilbanksgouinlock.com

One Ameris Center
3490 Piedmont Rd., NE
Suite 1010
Atlanta, GA 30305
Tel: (404) 842-1075
Fax: (404) 842-0559

*Admission pro hac vice pending